IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ESTATE OF ANDREW WAHNEE MOPPIN-BUCKSKIN, et al.,

      Plaintiffs,

  v.

CITY OF OAKLAND, et al.,

      Defendants.
_____

AND RELATED COUNTER- AND CROSS-CLAIMS
_____/

No. C 08-04328 CW

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    This is an excessive force civil rights case arising from the tragic death of twenty-year-old Andrew Wahnee Moppin-Buckskin at the hands of Oakland police officers.  Plaintiffs Estate of Andrew Wahnee Moppin-Buckskin, Sonja Wahnee Moppin, Michael Moppin, and minors A.M.B. and A.W.M.B. have sued Defendants City of Oakland and Oakland Police Officers Hector Jimenez, J. Borello and Barry Hofman in their individual and official capacities under 42 U.S.C. § 1983.  In this summary judgment motion, Defendants argue that there are no

triable issues of material fact and that they are entitled to judgment as a matter of law. Plaintiffs oppose the motion. The matter was heard on December 10, 2009. Having considered oral argument and all of the papers filed by the parties, the Court grants Defendants' motion.

BACKGROUND

On December 31, 2007, at 7:30 p.m. Oakland Police Officers Keith Souza and Jason Mitchell pulled Mr. Moppin over near 46th Avenue and International Boulevard in Oakland for failing to stop completely at a stop sign. After the car stopped, Mr. Moppin and two passengers exited the car. Mr. Moppin then fled on foot. Sergeant Barry Hofman responded to the scene of the initial car stop and began looking for Mr. Moppin by driving around the neighborhood.

While driving southbound on 47th Avenue, Sgt. Hofman found Mr. Moppin hiding underneath a parked Ford Explorer. Hofman Dep. at 61-62. Sgt. Hofman then notified dispatch that he located Mr. Moppin. Sgt. Hofman reversed his car and kept a distance of about ninety feet between himself and Mr. Moppin. Hofman Dep. at 64. He backed away so that he could call additional officers for help and so as not to force Mr. Moppin to act. Hofman Dep. at 63. Officers Hector Jimenez and Jessica Borello arrived by patrol car at the scene from the south and saw Sgt. Hofman in his patrol car. Sgt. Hofman then turned his patrol car's spotlight on the Explorer to notify Officers Jimenez and Borello of Mr. Moppin's location. Hofman Dep. at 65. Once Officer Borello directed her spotlight on the car, she saw Mr. Moppin crouched down, between the car and an adjacent fence, with his hands between his legs. Officers Jimenez

1  and Borello stopped their patrol car about seven to ten feet south
2  of Mr. Moppin and the Explorer. Jimenez Dep. at 65. They got out
3  of their patrol car with their guns drawn in the "contact ready"
4  position, pointed at Mr. Moppin.[1] Officers Jimenez and Borello
5  repeatedly ordered Mr. Moppin to stand up and put his hands up. At
6  this point, Mr. Moppin was about ten feet away from the Officers
7  Jimenez and Borello, but he did not comply with their commands and
8  they could not see his hands.

9  While still in the crouched position, Mr. Moppin said, "What?
10 I haven't done anything wrong. I'm just back here taking a shit."
11 Hofman Dep., 87-88.[2] Officer Jimenez responded, "[N]o you're not
12 'cause I see your pants are up." Jimenez Dep. at 129. After
13 several seconds, Mr. Moppin stood up and slowly raised his hands up
14 near his ears, palms open and facing Officers Jimenez and Borello.
15 Borello Dep. at 59; Jimenez Dep. at 78.

16 At this point, Mr. Moppin was standing in a narrow area,
17 approximately three feet wide, between the Explorer and the fence.
18 Hofman Dep. at 86. He was standing near the rear-passenger door of
19 the Explorer. Hofman Dep. at 86. Officer Jimenez gave several
20 more commands to Mr. Moppin to step closer to the officers because
21 they did not want to be trapped between the wall and the car. Mr.
22 Moppin did not move forward. Instead, Mr. Moppin cursed at the

---

[1] According to Officer Jimenez, the contact ready position is when "you have your strong hand on the grip, you have the weak hand covering so the recoil won't push the weapon in that direction. You have -- your feet staggered, so you have your left foot a little more ahead than your right foot; knees are bent, your back is crouched, your arms are extended out." Jimenez Dep. at 84. The trigger finger is along "the slide of the weapon." Id. at 85.

[2] Officer Borello similarly testified that Mr. Moppin stated, "What the fuck. I'm taking a shit." Borello Dep. at 59.

3

officers, "What the fuck did I do?"  Officer Jimenez then said, "If you don't walk toward me, I'm going to shoot you."  Jimenez Dep. at 80.  Officer Jimenez made this threat "hopefully to scare him to walk towards me so we could take him into custody."  Id. at 81.  Mr. Moppin responded, "I don't give a fuck if you shoot me, I've been shot before."  Borello Dep. at 63; Jimenez Dep. at 82.

Officer Borello testified that Mr. Moppin's hands were up for five seconds.  Borello Dep. at 63.  Then, according to Officer Borello, Mr. Moppin took one step towards Officers Jimenez and Borello and, with his right hand, he reached towards his back waistband and turned his body to his right, slightly away from Officers Jimenez and Borello.  Borello Dep. at 65.  According to Officer Jimenez, Mr. Moppin did not move towards the officers and did not turn his body when he reached for the small of his back.  Jimenez Dep. at 83-86.  As Mr. Moppin was lowering his right hand, Officer Borello screamed, "Let me see your hands, let me see your hands."  Borello Dep. at 66.  Once, Mr. Moppin's right hand disappeared behind his back, both Officers Jimenez and Borello fired their weapons.  Borello Dep. at 65-67; Jimenez Dep. at 82-87.

Officer Borello testified that Officer Jimenez fired his weapon before she fired hers because, at the time that Mr. Moppin reached towards his waist, she was getting ready to holster her weapon in order to handcuff him.  Borello Dep. at 67.  Officer Jimenez fired between three and four shots and Officer Borello fired one shot.  Jimenez Dep. at 89; Borello Dep. at 68.  Both officers testified that they believed Mr. Moppin was reaching for a weapon and that their lives were in danger.  Jimenez Dep. at 86, 130; Borello Dep. at 61-62.

4

By the time of the shooting, Sgt. Hofman had exited his car and had moved to within ten to twelve feet of Mr. Moppin. Hofman Dep. at 77-84. Sgt. Hofman approached the scene from the north and was crouching by the front passenger fender of the Explorer at the time of the shooting. Hofman Dep. 85-87. Mr. Moppin's back was facing Sgt. Hofman throughout the incident. Hofman Dep. at 85-87. He could see Mr. Moppin clearly but his view of Officers Jimenez and Borillo was obstructed by the Explorer. Hofman Dep. at 85-87, 104. Sgt. Hofman testified that Mr. Moppin's hands were up for "less than a second." Hofman Dep. at 89-90. According to Sgt. Hofman, once Mr. Moppin dropped his hands, Mr. Moppin said "something akin of, 'Fuck you, I didn't do anything.'" Hofman Dep. at 90-91. Sgt. Hofman then said to Mr. Moppin, "Dude, get your hands up." Hofman Dep. at 109-111. A "few seconds" later, Mr. Moppin turned "maybe ninety degrees" counter-clockwise and reached with his right hand into his right front pocket. Hofman Dep. at 99-100, 112. Later in Sgt. Hofman's deposition, he changed his testimony and said that Mr. Moppin "must have turned clockwise, towards his right" because he saw Mr. Moppin's right hand as it entered the right front pocket. Hofman Dep. at 134. While observing Mr. Moppin reach for his pocket, Sgt. Hofman yelled, "He's reaching." Hofman Dep. at 105. At the same time, Officers Jimenez and Borello fired their guns. Hofman Dep. at 105. Sgt. Hofman claimed that he did not have his gun drawn, but that if he had, he would also have shot Mr. Moppin. Hofman Dep. at 134.

Officer Thomas Doan was also at the scene of the shooting. He arrived after Sgt. Hofman and Officers Jimenez and Borello, but before the shots were fired. Officer Doan parked his car near Sgt.

Hofman's and approached the Explorer from the north.  At the time of the shooting, Officer Doan was about five feet from the middle of the driver's side door of the Explorer.  Doan Dep. at 75.[3]  At all times, his view of Mr. Moppin was obstructed by the Explorer.  Doan Dep. at 50.  Because of the position of the Explorer, Officer Doan could only see Mr. Moppin's head through the Explorer's windows.  But, "other than that, I couldn't see him at all."  Doan Dep. at 50.  Officer Doan stated that he did not fire his own weapon because he "couldn't see anything that would make me, you know, want to have to defend myself."  Doan Dep. at 81.

After Officers Jimenez and Borello shot Mr. Moppin, Mr. Moppin fell to the ground and crawled under the Explorer.  Hofman Dep. at 115.  Officer Jimenez handcuffed Mr. Moppin and Sgt. Hofman checked him for vital signs and saw that he was conscious and breathing.  Jimenez Dep. at 98, 100; Hofman Dep. at 117.  Officer Borello searched Mr. Moppin's waistband but did not find a weapon.  Borello Dep. at 75.  Mr. Moppin died later that evening.

On July 25, 2008 the Executive Force Review Board of the Oakland Police Department concluded that the shots fired by Officers Borello and Jimenez were reasonable and within Departmental use of force policy.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is

---

[3] At another point in Officer Doan's deposition, he testified that he was twelve to fifteen feet from the Explorer at the time of the shooting.  Doan Dep. at 53.

6

clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## DISCUSSION

I. Individual Liability Under 42 U.S.C. § 1983

Plaintiffs' case hinges on whether Officers Jimenez's and Borello's use of lethal force was reasonable under the circumstances after drawing all inferences in favor of Plaintiffs. The Court concludes that it was.

Claims of excessive force which arise in the context of an arrest, investigative stop or other seizure of a person are analyzed under a reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). The use of deadly force is a seizure subject

7

to the reasonableness requirement of the Fourth Amendment. <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985).

The question in an excessive use of force claim is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Graham</u>, 490 U.S. at 397. Determining whether use of force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." <u>Id.</u> at 396 (quoting in part <u>United States v. Place</u>, 462 U.S. 696, 703 (1983)). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396-97.

An officer's use of lethal force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." <u>Garner</u>, 471 U.S. at 3. The Ninth Circuit has recognized that deadly force cases "pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness." <u>Scott v. Henrich</u>, 39 F.3d 912, 915 (9th Cir. 1992). Thus, the court "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story -- the person shot dead -- is unable to

8

1 testify. The judge must carefully examine all the evidence in the
2 record, such as medical reports, contemporaneous statements by the
3 officer and the available physical evidence, as well as any expert
4 testimony proffered by the plaintiff, to determine whether the
5 officer's story is internally consistent and consistent with other
6 known facts." Id.

7 Here, the undisputed evidence shows that Officers Jimenez and
8 Borello acted reasonably when they used deadly force against Mr.
9 Moppin. When Officers Jimenez and Borello encountered Mr. Moppin,
10 they knew that he had recently fled from the scene of a traffic
11 stop. Officers are taught this may be a sign that a suspect could
12 be armed or may have committed an offense more serious than a
13 traffic violation. Falfine Dep. at 14. Once found by police
14 officers, Mr. Moppin failed to obey their commands. Initially, he
15 refused to stand up and raise his hands and throughout the incident
16 he was verbally combative. The officers shot Mr. Moppin only after
17 he failed to come toward them, as ordered, dropped his hands and
18 then made a movement toward his waist area as though reaching for a
19 weapon. All three officers who could see Mr. Moppin unequivocally
20 thought that he was reaching for a gun and feared for their safety.
21 Therefore, in this case, the test for objective reasonableness is
22 met.

23 Plaintiffs argue that Officer Doan's testimony creates a
24 triable issue of material fact. However, nothing in Officer Doan's
25 account of the events contradicts those of Officers Jimenez,
26 Borello or Sgt. Hofman. Plaintiffs make much of the fact that,
27 throughout the entire incident, Officer Doan did not see Mr. Moppin
28 reach to his waistband and that he "couldn't see anything that

9

would make me, you know, want to have to defend myself." Doan Dep. at 81. However, this is not surprising because Officer Doan's view of Mr. Moppin was obstructed by the Explorer. His vision was limited to what he could see through the Explorer's windows only. Thus, Officer Doan could only see Mr. Moppin's face and not the rest of his body. Therefore, Plaintiffs' attempt to use Officer Doan's testimony to attack the objective reasonableness of the officers' response fails.

Plaintiffs' assertions that Mr. Moppin was cooperative and unthreatening is also unsupported by the record. Upon first approaching Mr. Moppin, Officers Jimenez and Borello repeatedly commanded that he stand up and show his hands. Mr. Moppin was slow to follow these commands, and when he finally did raise his hands, he only kept them up for a few seconds at the most. Further, Mr. Moppin verbally challenged the officers throughout the incident. To support their assertion that Mr. Moppin was compliant, Plaintiffs rely on the testimony of Lennart Persson. Persson was seated in his parked truck and viewed the incident through his driver's side rear-view mirror. He never saw Mr. Moppin at any point during the incident and he primarily heard the events from his left ear, which is his "bad ear;" he can only hear seventy to eighty percent of normal out of that ear. Further, the parties do not state how far Mr. Persson was from the scene of the shooting. Thus, his testimony does not create a triable issue of a material fact.

Plaintiffs also argue that Officers Jimenez and Borello and Sgt. Hofman testified inconsistently about the nature of Mr. Moppin's movement which prompted the shooting. Primarily,

10

Plaintiffs take issue with the inconsistency between Officers Jimenez's and Borello's testimony that Mr. Moppin reached towards his back waistband with his right hand and Sgt. Hofman's testimony that Mr. Moppin reached for his front right pocket with his right hand.  However, considering that Sgt. Hofman viewed the incident from behind Mr. Moppin whereas Officers Jimenez and Borello were facing him, these statements are not inconsistent.  Mr. Moppin turned toward Sgt. Hofman's position, and, in that split-second when his right hand went out of Officers Jimenez's and Borello's sight, it came into Sgt. Hofman's view.  Thus, where Officers Jimenez and Borello inferred the destination of Mr. Moppin's hand once it went out of view, Sgt. Hofman could see it directly.  All three officers testified that Mr. Moppin lowered his hands and suddenly reached down and towards the right of his pants.  In the course of this split-second movement, the substantive difference between Mr. Moppin's right front pocket and rear waistband is immaterial.

    Plaintiffs assert that Mr. Moppin was turning to his right in response to something Sgt. Hofman said to him and not as part of a reaching motion towards his pants.  However, responding to Sgt. Hofman did not require Mr. Moppin to put his hands down and reach for his waistband with two armed officers in front of him repeatedly ordering him to keep his hands up.  Further, Plaintiffs' arguments that the officers gave inconsistent commands is not supported by the record.  Although more than one officer was speaking to Mr. Moppin at a time, they were all commanding him to do the same things -- to keep his hands up and in view.

    Plaintiffs lastly assert that Defendants' version of the

11

events could not have happened as they recount in the short time span that the incident actually occurred. The audio dispatch report shows that only twelve seconds elapsed from when Officer Borello announced that she was "on scene" and the announcement of shots fired. Chanin Decl., Exh. 18. Plaintiffs argue that twelve seconds is not sufficient time for Officers Borello and Jimenez to observe enough of the situation to use deadly force reasonably against Mr. Moppin. Plaintiffs assert, therefore, that Defendants' recollection of the events is, at best, inaccurate, or, at worst, fabricated.

Defendants claim that the recording Plaintiffs rely on does not represent the real time occurrence of the events because unrelated incidents and gaps resulting from radio silence were deleted from the recording. Cota Decl. ¶¶ 7-8. Plaintiffs dispute this assertion. However, even if the recording accurately represents that twelve seconds elapsed from when Officer Borello arrived on the scene until she shot Mr. Moppin, this does not render her use of force unreasonable. There is nothing inconsistent between the twelve second time frame and Defendants' testimony. The unfortunate reality of Mr. Moppin's death is that it represents an example of how a sudden furtive movement in defiance of an officer's order can reasonably precipitate an officer's use of lethal force.[4]

In sum, Mr. Moppin's belligerent behavior, reluctance to

---

[4] To the extent that the Court relied upon evidence to which the parties objected, the objections are overruled. The Court did not rely on any inadmissible evidence in reaching its decision. To the extent the Court did not rely on evidence to which the parties objected, the objections are overruled as moot.

12

comply with commands, the lowering of his hands and reaching towards his waistband and his statement that he didn't "give a fuck" if the officers shot him because he had been shot before, would lead a reasonable officer to believe he was reaching for a weapon. Therefore, the Court grants summary judgment for Defendants on Plaintiffs' § 1983 claims against the individual officers.[5]

II. Municipal Liability Under 42 U.S.C. § 1983

The City of Oakland cannot be liable under § 1983 because there has been no violation of Plaintiffs' constitutional rights. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual officer, the fact that the departmental regulations might have authorized [the constitutional violation] is quite beside the point."); Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996) ("Thus, an individual may recover under § 1983 only when his federal rights have been violated.").

However, even if Plaintiffs could prove a violation of their constitutional rights, they have not shown that their injuries were caused by an official policy of the City of Oakland, as required under Monell v. New York Department of Social Services, 436 U.S. 658, 694 (1978).

Plaintiffs argue that Oakland's failure adequately to train its officers caused Mr. Moppin's death. In the failure to train context, "evidence of a single violation of federal rights, accompanied by showing that a municipality has failed to train its

---

[5] For the same reasons, Plaintiffs' state wrongful death claims also fail.

13

employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 409 (1997).  The Supreme Court has noted "in a narrow range of circumstances, that a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  Id. at 410.  This involves circumstances in which such a violation of a federal right was the "plainly obvious consequence" of a "particular glaring omission in a training regimen."  Id.

Here, Plaintiffs have not presented evidence of any deficiencies within Oakland Police Department's training regimen or a failure to train regarding recurring situations.  Plaintiffs focus on the fact that the Executive Force Review Board identified a few issues that required more training regarding (1) cover, (2) use of flashlights and (3) Sgt. Hofman's inability to fire at the suspect because his gun was holstered and his failure to take control of the scene.  However, these recommendations were given after the shooting incident and, therefore, do not pertain to the adequacy of the officers' training before the incident.  Moreover, the Board concluded that the officers' conduct was reasonable and did not violate the Department's use of force policy, which was itself constitutional.  In sum, Plaintiffs have failed to demonstrate any link between a municipal policy or custom and the alleged constitutional deprivations.  Therefore, the Court grants summary judgment for Defendants on Plaintiffs' Monell claim.

14

CONCLUSION

For the foregoing reasons, the Court grants Defendants' summary judgment motion (Docket No. 35).  The clerk shall enter judgment for Defendants and the parties shall bear their own costs.

IT IS SO ORDERED.

Dated: 01/12/10

CLAUDIA WILKEN
United States District Judge